Good morning. Illinois Appellate Court First District Court is now in session. The Fourth Division, the Honorable Justice Robert E. Gordon presiding. Case number 19-2028, Chicago Sun Times versus Chicago Transit Authority. Well, good morning to all and with the lawyers who are going to argue the case, please introduce yourself to the court. Good morning. My name is Irina Dmitrieva and I will argue the case on behalf of the Chicago Transit Authority. Good morning, Your Honors. Josh Berday on behalf of Chicago Sun Times. As to the appellant, are you going to reserve some time for rebuttal? Yes, I would like to reserve about five minutes for rebuttal. Okay, you know, that gives you 10 minutes plus five. You understand that? Yes. Okay. All right, let's proceed. Good morning, Your Honors, and may it please the court. This case is of great importance to the Chicago Transit Authority because it potentially affects security sensitive video footage from thousands of surveillance cameras installed in the interiors of the city rail stations. And it has a potential to compromise security sensitive information about those 145 city rail stations. As we explained in our brief, the rail station cameras were installed, you know, began to be installed in the immediate aftermath of the September 11, 2001 terrorist attacks. And they were funded in large part by the Department of Homeland Security through its transit security grant program designed to protect critical transportation infrastructure from terrorist attacks and other major incidents. CTA is a mass transit agency is a part of critical transportation infrastructure. As our Homeland Security expert explained, mass transit remains a notorious terrorist target, because it is considered to be a soft target. It provides access to large crowds of people on the predictable schedule with little security in place. Soft targets, including mass transit facilities, could be attacked using simple tactics, such as small arms or improvised explosive devices. Let me ask you a question. Yes. The judge here. Did she make factual findings on a motion for summary judgment here? Yes, your honor. And this is one of the reasons that we believe that the ruling is wrong, because she made a factual finding with no factual basis in the record to support it. Specifically, the judge found after in-camera inspection of the video that any common person going down to the platforms, to the Washington platform, could determine where the blind spots are, and that is behind the columns. There is absolutely nothing in the factual record, in the record in this case, to support this finding, because certainly the plaintiff's experts, you know, they didn't opine on that. First of all, the affidavit was not based on personal knowledge, which is required by Supreme Court Rule 191. Neither of them states that they ever used CTA, that they ever went to any CTA platform, let alone the Washington platform. They for sure did not opine where the blind spots are on the Washington platform. There is no way in the affidavit you would find where they would say, we went to the Washington platform, we located the cameras, and we were able to determine that the blind spots are behind the columns. Second, you know, this notion that the blind spots are behind the columns, for certain, you know, if your owners look at the video, which we provided as a part of secured record, there is one very focal blind spot there. But this is not the only blind spot on the Washington platform. There are others. So it's very simplistic to say, well, there is this one blind spot. There are others. Just the way that our platforms and stations are constructed, there are a lot of structures in place. These are not just columns. There are information kiosks, there are elevators. And so there are a number of blind spots in the immediate proximity to tracks, to the traveling public, and the public disclosure of this information would be very detrimental to the security of our stations. If I may continue. And so, as we also explained, the security cameras at the CTA stations, railway cameras, they are capable of providing live video feedback. We just don't have resources right now to watch it on a continuous basis. But there is this capability. And if need be, the City of Chicago's Office of Emergency Management Communications and the CTA's Control Center could be watching the situation in real time, directing the actions of first responders. And if those first responders, the situation could be put in jeopardy if they are directed to a spot, for instance, which the offenders already knew would be a blind spot and they could plant an explosive device there. So this all emphasizes that the CTA security system is not foolproof. So the video coverage is not universal. There are areas that are beyond the camera's reach. Again, they are not limited to locations behind the columns. In some areas, they could be caught on the camera, but the resolution of the image or the clarity image would be poor enough so the information would not be useful. And so this information about the blind spots, about the clarity and resolution of the image, it reveals current weaknesses in the CTA security system. Current weaknesses. It will not be old information, which is like years old. It will be current because under the freedom of information law, we would be required to produce this within a short period of time, five to 10 days. So the cameras, it would not have enough time to adjust, you know, change the angle. It will be virtually, you know, in real time providing information about current vulnerabilities in our system, providing information about individual collective blind spots of our cameras. Yet under the circuit court's ruling in this case, CTA would have to provide this information without any way of knowing who requested and why. Because under the freedom of information law, as everybody is, you know, painfully aware, the identity of the requester and the purpose of the request are absolutely irrelevant. As long as we have an email address for the requester, the CTA is producing, you know, the FOIA information if it is not exempt. What is also important is that the circuit court did realize this danger, and it sought to limit its ruling to the unique circumstances of this case without making it a binding precedent for other FOIA requests. It states that the ruling cannot be used as precedent for any other request. But we submit that the ruling cannot be so easily contained. In a sense, it lets the genie out of the bottle. And why? Because the rationale for the circuit court's ruling is not fact-specific to this case. It would apply with equal force to other requests under Freedom of Information Act for railway station footage. Specifically, the court ruled that even though videos reveal collective blind spots, their release does not, in the court's opinion, jeopardize the effectiveness of video cameras because, as I previously explained, any common person who actually goes down to the platforms can determine where the blind spots are, and that is behind the columns. And so, as I explained, you know, one part of the ruling is completely wrong because there is no factual basis for this determination. The only person who went down to the platform, looked at the cameras, and then viewed the videos, which was our expert, Fagel, The only competent evidence on this point in the record is that without viewing the videos, blind spots cannot be located. But there is another reason why the court's decision is wrong. It's because the court was aware of the standard, but it misapplied it. It didn't apply the correct legal standard. The plain language of Section 7.1.V does not require the CTA to prove that disclosing information about the blind spots on the Washington platform, in fact, jeopardizes or would, with certainty, jeopardize the effectiveness of our security measures. The legal standard adopted by the Illinois General Assembly after two years of intensive negotiations with all stakeholders, including the Illinois Press Association, is much more differential to public agencies. The CTA only has to demonstrate that disclosure could reasonably be expected to jeopardize the effectiveness of its security measures. This is a differential reasonable standard. You know, you're already past your time. So, you know, try to sum up if you can. Yes. Well, I believe I covered, you know, You'll have your rebuttal time. Yes, I covered most of the points. So I would, I would reserve my time for rebuttal. Thank you, Your Honors. Okay, and we'll give, you know, we'll give the appellee some additional time since she's taking additional time. All right. Let's hear from the appellee. Thank you, Your Honor. May it please the court, Josh Berday on behalf of Sun Times. I'm going to respond to the points that counsel said, and I just want to start with one basic overarching point that I think was touched on briefly already, and that is that CTA's entire claim is based on a factual assertion that the circuit court rejected based on in-camera review. And there's no legal error here. So where does CTA start then when it opened with its argument? Well, it doesn't talk about the facts of the case. It doesn't talk about the legal analysis of the case. It talks about this would endanger 145 CTA stations, but all that's at issue here is one part of one station. And the circuit court was certainly well aware of those concerns, which CTA repeated a number of times before the trial court as well. Let me ask you this question, the same question I've asked the appellant. This is a motion for summary judgment. Did not the trial court here make factual findings? Yes, and the trial court performed an in-camera review of the footage in question as well. Can you make factual findings on a motion for summary judgment? I think as a practical matter in FOIA cases, when judges review records in camera, then that's part of what happens. Well, is that what the law says, that judges can make factual findings on motions for summary judgment? Do you have any case that says that? No, no site, Your Honor. And so the judge reviewed the footage in camera, and that was what the ruling was based on. And of course, there were expert affiants as well. So we talked about a number of things, including that there's much footage that's been released from CTA stations and elsewhere in the past. And at no point did they ever demonstrate that that caused any form of harm or anything along those lines. Do they have to demonstrate harm? Is that in the statute, that they have to demonstrate harm or that it could possibly inhibit their ability to protect? The full standard is reasonable. Is there anything that says they ever have to? Exactly. Yes, so I did. Apologies, Your Honor, you're breaking up a little bit, but I believe I still have the question. Yeah, I saw that. Unfortunately, I'm breaking up. I believe I heard the question, though. Yes, I did not recite the full statutory standard. The full statutory standard is could reasonably be expected to jeopardize the effectiveness, and then it continues on the measures, so on and so forth. So let me talk about the CTA really tries to latch on to the fact that the trial court didn't always recite the full statutory standard before making statements in the proceedings below. Before issuing the ruling, the court did do exactly that, recited the full exact statutory standard, and there were other times that she referenced, the court referenced the statutory standard. The fact that she didn't recite the whole thing verbatim every single time she was making a point in the ruling by no means means that the wrong standard was applied. And when you actually look at the analysis that was performed, then you can also see that the correct standard was applied when doing the analysis and discussing the language, right? Actually looking at the video footage and seeing that the blind spots would be visible to the naked eye. And that was laid out in our expert affidavits to expert affidavits as well. So that's one way that they try to come up with legal error saying that the circuit court applied the wrong standard. Let me touch on another point that CTA has now gone back and forth on. In their briefing, they say, no, don't apply the clear and convincing evidence standard that's in the plain language of statute. Instead, apply some different standard, apply federal law. Well, we just heard counsel agree previously in her argument that it is the clear and convincing evidence standard. And so just to be clear, because I don't know where CTA is going to finally end up on that point, I just want to reiterate a couple of things. One is clear and convincing evidence applies that's stated in the plain language of FOIA section 1.2. Next, I would point out that CTA conceded before the trial court as well that it's the clear and convincing evidence standard that applies. That's on R10 in the record when the judges directly ask counsel is a defendant's burden to prove by clear and convincing evidence that the exemption applies and counsel answers correct. And lastly, I would point out the Lucy Parsons lab case, which CTA itself brought up. And they point out that the cases aren't factually analogous, which is, you know, sure, we're talking about that case for the legal analysis, right? It's addressing the exact same exemption claim where the court noted that the clear and convincing evidence standard applies. The court noted that the public body bears the burden of proving its exemption claims by clear and convincing evidence, and then says the exemption in the very next sentence, it says, and the exemption here to be proven is 7-1-V. The court rejected any what it termed rewrites of any exemption language when saying that. So those are three different reasons for applying that standard. Let me quickly touch on a number of other points that CTA just kind of quickly through. Some of them came up in the briefing and some of them came up at the argument. So we already heard the trying to extrapolate into, you know, this one station, this one specific case that we already heard them trying to extrapolate into, oh, that's going to spell doom for the entire system. Well, this was, you know, FOIA cases are fact specific, and the court said this is specific to this case. I would point out that the federal case law, though there's no need to ever go there, it supports us. And that standard that they asked for doesn't apply, but even under a lower standard, we would still easily prevail. And those cases that we cited, they point out, for example, the side case where footage was released from international airports. Even in that case, right, some footage was produced and some was not. So to say that producing footage in one case, you know, means that footage always has to be produced for all time. That's been the trial court itself said that's not the case. And then you look at federal case law where there are times when some videos produced and some isn't. And then there were other federal cases that we cited that contemplated the disclosure of surveillance footage, sometimes surveillance footage from international airports. That was in at least two cases. That was the Burt case, that was the other case that contemplated disclosing footage from the airports, but ended up, they didn't actually locate any, so it wasn't actually produced, even though they were going to produce it if they found it. Just a moment to review my notes momentarily, Your Honors. So I wasn't sure how much the court and Your Honors ultimately wanted to get into the facts underlying what happened here, but I would just briefly touch on the fact that the crux of their entire assertion of 7-1-V is the claim that, quote, the only way to identify the field of view and blind spots of CTA cameras is to view the video recorded by those cameras. And as our expert affidavit stated, that statement is false and it's incorrect. And they walked through that in some detail. And what the trial court had to say about their affidavit was it spoke generally about security concerns and terrorism and mass transit, but it didn't get specific. And that was part of the problem was it didn't get specific to this case and they failed to prove by clear and convincing evidence that the legal standard could reasonably be expected to jeopardize that legal standard could be applied to this case. And they even so they say they make a variety of claims, and I'm not going to be touching on all of them due to time, but one of the many claims is they point to the Madrid and London transit attacks. Yet, those examples just further support us. As our experts stated, attacks on Madrid and London transit systems are prime examples of systems with near panopticon surveillance camera coverage, which served as no deterrent to the attackers. So if we get to that level of going back to the burden of proof, they CTA failed to carry its burden of proof in three ways. One, there are other ways to determine the blind spots besides viewing the footage to even viewing the footage does not disclose the blind spots blind spots and three revealing the blind spots cannot reasonably be expected to jeopardize the effectiveness. I want to talk about even viewing the footage doesn't tell you the cameras capabilities right we went into this in good detail and affidavits and in the briefing below, but there's all these different things you need to know right you need to know the lens on the cameras at wide angle is it is it is it a fish fisheye lens is the camera zoomed in or not some of these various things are very technical and not immediately intuitive but some of them, even a regular person can understand if you're looking at camera footage, you don't know if that camera doesn't see you this can be decided on a motion for summary judgment. What's your opinion. My opinion is yes it can be decided on a motion for summary judgment, it was after review of the affidavits and in camera review, then it certainly could be I did say at the trial court another option would be to proceed to an evidentiary hearing. I don't believe that's necessary I believe everything was reviewed, but that is another option which I believe Your Honor might be getting at a little bit here. Well, it looks like it's a factual issue to me, each side has a different set of facts here. Am I wrong. What would the facts in dispute be I mean, I understand what you're saying but it seems like their basic claim. Now, is just to try to somehow change the legal standard. I think we could go back and have an evidentiary factual hearing, I don't know that that would ultimately change anything. I believe I am almost out of time. So, happy to answer more questions. Does anyone in the panel have any questions. No, thank you. No. All right, then let's hear the rebuttal. Okay, owners. Well, we certainly have a position that the only competent evidence in the record on the issue of whether blind spots you know could be located is our expert, because he's the only one who did it on personal knowledge, you know supported his affidavit with specific facts as required by rule 191, and attached all of the materials on which he relied. You know the plaintiff's experts did not do that they did not visit the platform they did not look at the camera so there is no personal knowledge involved here from from plaintiffs experts so there is no factual basis at all for the circuit courts the factual finding. I also would like to take issue with plaintiffs repeated misrepresentation to the court that, you know, there are cases in which critical transportation agencies such as the national airports released the security camera footage, where the agencies believe that the footage compromise their security, this is certainly not correct and side case does not stand for that preposition side case involved transportation security agency TSA. And if you know it's a long, it's a long opinion which I read multiple times and actually within the body of that opinion the court explains that under the governing statute, the statute governing transportation security administration, the TSA has discretion to determine that certain information damages security and it has discretion to withhold it, and its decision cannot be attacked in a federal district court, it can only be attacked on that on appeal to the release security compromise and video footage in Burke I'm not quite sure where council, you know, is getting information that the agency intended to release that footage, there is certainly a logical difference between locating the responsive records, and then making it clear that the exemption has to be proven, we have to prove by clean convincing evidence that we have a reasonable expectation that disclosure of this information would the risk, you know jeopardizing the effectiveness of our measures. So there are two standards here but the most specific one that relates to our decision making is the differential reasonableness standard. And so, so you cannot just the statute needs to be read with explained text we can you cannot read this reasonable differential standard out of the statute. And so this is what I have on reply. Any questions by any members of the panel. Absolutely not. I would say I've enjoyed the argument. Yes, I think you've gave us a very interesting case, and we haven't. It's a great consequence for the city. It's a very I think it is an important case and shortly you will have a decision in this case. Thank you. And the court will be adjourned but I asked the justices to remain.